# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 99 C 763 | **DATE** | 5/31/2000 |
| **CASE TITLE** | Nabisco, Inc., et al. Vs. American United Logistics, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Report and recommendation recommending that all non-insurer defendants' motions to dismiss counts III and IV of the third amended complaint [123-1, 124-1, 127-1, 128-1, 130-1, 179-1] be granted, and that defendant AUL's motion to dismiss counts I and II and for a more definite statement [123-1, 123-2] be denied is hereby submitted to Judge Bucklo.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 11 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUN 0 1 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | 192 |
| | Mail AO 450 form. | | | |
| ✓ | Copy to judge/magistrate judge. | | 5/31/2000 date mailed notice | |
| IS | courtroom deputy's initials | | IS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NABISCO, INC., et al.,                        )
                                              )
                    Plaintiff,                )      Case No. 99 C 0763
                                              )
        v.                                    )      Judge Elaine E. Bucklo
                                              )
AMERICAN UNITED LOGISTICS, INC.,              )      Magistrate Judge
CATELLUS DEVELOPMENT CORPORATION,             )        Martin C. Ashman
KRUSINSKI CONSTRUCTION COMPANY,               )
BRANDONISIO CONSTRUCTION                      )
CORPORATION, ARCHEM INC. d/b/a                )
ARTLOW SYSTEMS, SPECCO INDUSTRIES,            )      DOCKETED
INC., HYDRITE CHEMICAL CO., INC.,             )
AMERICAN HOME ASSURANCE COMPANY,              )      JUN 0 1 2000
GERLING-KONZERN ALLGEMEINE,                   )
VERICHERUNGS-AG, SR INTERNATIONAL             )
BUSINESS INSURANCE COMPANY LTD.,              )
ST. PAUL FIRE AND MARINE                      )
INSURANCE COMPANY, ASSICURAZIONI              )
GENERALI S.p.A., and ALLIANZ                  )
INSURANCE COMPANY,                            )
                                              )
                    Defendants.               )

## REPORT AND RECOMMENDATION

Plaintiff, Nabisco, Inc., filed a six-count complaint against several insurance companies and American United Logistics, Inc. ("AUL"), Catellus Development Corp. ("Catellus"), Krusinski Construction Co. ("Krusinski"), Specco Industries, Inc. ("Specco"), Hydrite Chemical Co., Inc. ("Hydrite"), Brandonisio Construction Corp. ("Brandonisio"), and Archem, Inc. ("Archem") d/b/a Artlow Systems (hereafter, the "non-insurer Defendants"), alleging breach of contract and negligence against the non-insurer Defendants. These defendants have filed motions to

dismiss the negligence and breach of contract counts of the Third Amended Complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  For the reasons that follow, this Court recommends that the negligence claims be dismissed.

## I.   Background

### A.   Motion to Dismiss Standard

In ruling on a motion to dismiss, the court must construe the pleadings in the light most favorable to the plaintiff, *see Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), taking as true all well pleaded allegations and any reasonable inferences therefrom in the complaint, *see Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995).  Accordingly, a motion to dismiss should not be granted "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Under the federal system of "notice pleading," a plaintiff need only furnish "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

---

[1]   The non-insurers' motions were originally directed against the Second Amended Complaint, but subsequently, Plaintiff was granted leave to file a Third Amended Complaint.  For the sake of convenience, this Court will treat all non-insurers' motions to dismiss the Second Amended Complaint as directed against the Third Amended Complaint.  (*See* docket entry [173-1].)

*Leatherman v. Tarrant County Narcotics Intelligence And
Coordination Unit*, 507 U.S. 163, 168 (1993).

### B. Allegations of the Third Amended Complaint

According to the Third Amended Complaint, on or about
September 1, 1998, Nabisco entered into a Public Warehouse
Storage, Handling, and Inventory Agreement (hereafter, the
"Warehouse Agreement") with AUL, pursuant to which AUL was to
store and assist in the distribution of large quantities of
Nabisco's food products. The Warehouse Agreement specifically
provided that Nabisco's food products "shall be stored, in
compliance with food products sanitation procedures, in an
orderly manner, . . ." and that "[p]oisonous or dangerous
chemicals, and/or items with foul odors or other undesirable
characteristics which may or have the potential to contaminate or
devalue shall not be sorted or handled in the same part of the
Warehouse" where Nabisco's food products were stored. (Third Am.
Compl., ¶ 19, Ex. A, at 2-3.)

Construction of the warehouse began in mid-1998. Catellus,
the owner of the warehouse, hired Krusinski to act as general
contractor responsible for overseeing the construction of the
warehouse. Krusinski, in turn, hired Brandonisio and Artlow to
construct the warehouse's concrete floor.

During construction, one-inch grooves were cut into the
surface of the floor to control cracking. In addition, support

columns were placed throughout the warehouse. Expansion joints were installed between the base of these columns and the concrete floor. As new concrete was poured, a product called "Cure and Seal," a concrete sealant made by Specco, was applied to the newly poured concrete, but the Complaint avers that Krusinski failed to seal the one-inch grooves or to clean them of debris. When the concrete floor had been poured and sealed, it was stripped with "Arslov," a product made by Hydrite. Both of these chemical products contained significant amounts of certain aromatic hydrocarbons.

By late August of 1998, the warehouse was ready to accept Nabisco's products, and on September 2, 1998, the first of Nabisco's products was moved into the warehouse. Over the next few months, a significant amount of Nabisco's products was moved into the warehouse.

In October of 1998, Nabisco began to receive an abnormally large number of phone calls from customers complaining about a chemical odor and flavor in several Nabisco products. After an investigation, Nabisco determined that all of these products had been stored at the warehouse. It also determined that these products contained small amounts of the same aromatic hydrocarbons that were emitted by the chemical compounds used during the construction of the warehouse floor. While these substances do not pose a health risk, they can cause affected food products to have a displeasing odor and taste.

As a result of an investigation, Nabisco learned that significant levels of aromatic hydrocarbons were present in air samples taken from the inside of the warehouse, particularly in the areas near the expansion joints and surrounding the groove cuts in the floor. Nabisco also concluded that these hydrocarbons had migrated through the air into a significant number of its food products, especially those located near the expansion joints and areas surrounding the groove cuts. After extensive sampling of the food products, Nabisco estimated that each of its products in the warehouse that were in "poly" packaging, regardless of its location in the warehouse, would contain at least trace levels of hydrocarbons. Nabisco believed that these products were no longer saleable and had to be destroyed.

Nabisco claims lost profits and damages associated with the destruction of a significant amount of its food product, recalling food product that had already been delivered to retail shelves, the investigation and testing of its food products in the warehouse, and storage of unsaleable food product.

Four counts of the Third Amended Complaint are directed against the non-insurer defendants. Counts I and II seek damages for breach of contract and a declaratory judgment against AUL. Count III accuses AUL, Catellus, Krusinski, Brandonisio, and Artlow of negligence. Count IV alleges that Specco and Hydrite, the makers of the chemical solvents, are liable for negligent failure to warn.

## II.  Discussion

### A.  The Tort Claims Are Barred By the Economic Loss Doctrine.

The non-insurer defendants argue that recovery under the tort claims is barred by the economic loss doctrine, which precludes tort recovery for so-called economic losses, regardless of the plaintiff's inability to recover in contract.  Nabisco claims that its negligence claims fall outside the scope of the economic loss doctrine, because they are not claims for "economic loss" as defined under Illinois law, and even if they are, they are excluded from the economic loss doctrine because they arose as a result of a sudden or dangerous occurrence.

The economic loss or *Moorman* doctrine was created by the Illinois Supreme Court's holding in *Moorman Manufacturing Company v. National Tank Company*, 435 N.E.2d 443 (Ill. 1982).  The Court there held that a plaintiff may not recover solely economic losses under tort theories of negligence or strict liability. *Id.* at 449-50.  It defined "economic losses" as:

> damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

*Id.* at 449 (internal quotations and citations omitted).  Remedy for losses "relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental

cause . . . lies in contract." *Id*. at 450. But where a plaintiff or his other property has been exposed to an unreasonable risk of injury, negligence (or strict) liability applies. *Id*. at 448.

Nabisco argues that the *Moorman* doctrine distinguishes between damage to the defective product itself and damage to "other property," and since Nabisco's negligence claim supposedly seeks to recover for damage to "other property," it falls outside the definition of an economic loss. But a claim for personal injury or damage to other property must arise from a "sudden, dangerous, or calamitous occurrence." *In re Chicago Flood Litig.*, 680 N.E.2d 265, 275-76 (Ill. 1997) ("For damages to be recoverable in tort, the sudden, dangerous, or calamitous occurrence must still result in personal injury or property damage."); *see also Trans State Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 54 (Ill. 1997) ("In the case of personal injury or other property damage, . . . we continue to require, for purposes of tort recovery, the coupling with a sudden and calamitous occurrence."). Therefore, it is not enough to allege damage to other property; nor is it sufficient to allege a sudden or dangerous occurrence. A plaintiff must allege damage to other property that was caused by a sudden or dangerous occurrence in order to pursue his claim under tort law. *See*

*Trans State Airlines*, 682 N.E.2d at 55 (citing *In re Chicago Flood Litig.*, 680 N.E.2d at 275).

In addition, the courts have found that drawing a distinction between economic loss and property damage as Nabisco proposes is unworkable because the demarcation between an economic loss and damage to other property is often blurred. *See Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*, 613 F. Supp. 985, 987-88 (N.D. Ill. 1985) (collecting cases). Rather, it is more helpful to look to the policies underlying the *Moorman* doctrine to determine whether tort or contract law should supply the appropriate remedy. *See Chicago Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723, 728 (7th Cir. 1986). Thus, where the nature of a defect is a "qualitative" one that merely fails to live up to a purchaser's commercial expectations, contract law supplies the remedy. *Moorman*, 435 N.E.2d at 450. But if the defect causes a sudden or dangerous occurrence which results in personal injury or damage to other property, tort law supplies the remedy. *See id.; see also Trans State Airlines*, 682 N.E.2d at 51. The factors to be analyzed in distinguishing between economic loss and property damage include: the nature of the defect, the type of risk, and the manner in which the injury arose. *See Trans State Airlines*, 682 N.E.2d at 51; *Moorman*, 435 N.E.2d at 450.

Finally, the *Moorman* doctrine applies with equal force to claims involving the negligent performance of services. *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200 (Ill. 1997); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986). It applies "regardless of the plaintiff's inability to recover under an action in contract." *Anderson Elec.*, 503 N.E.2d at 249; *see also Fireman's Fund*, 679 N.E.2d at 1200.

Nabisco cites two non-binding cases in support of its position that the *Moorman* exception does not require a sudden or dangerous occurrence on a claim for damage to other property. In *Reedar v. Old Oak Town Center*, 465 N.E.2d 113 (Ill. App. Ct. 3d Dist. 1984), decided before *In re Chicago Flood Litigation*, the court allowed a restaurant operator's negligence and strict liability claims against the restaurant's builder and material supplier to stand because it felt bound to do so by its prior decision in *Ferentchak v. Village of Frankfort*, 459 N.E.2d 1085 (Ill. App. Ct. 3d Dist. 1984), *rev'd on other grounds*, 475 N.E.2d 822 (Ill. 1985), in which it held that where a plaintiff does not have a direct or indirect contractual relationship with a negligent defendant, the plaintiff may sue that defendant to recover economic losses in tort because such losses are not related to the plaintiff's commercial expectations, but rather to

"traditional societal expectations and conduct." *Id.* at 1091.
However, since *Reedar*, the Illinois Supreme Court has repeatedly
held that the *Moorman* doctrine applies "regardless of the
plaintiff's inability to recover under an action in contract."
*Anderson Elec.*, 503 N.E.2d at 249 (mentioning *Ferentchak*, 459
N.E.2d 1085); *see also In re Chicago Flood Litig.*, 680 N.E.2d at
275; *Congregation of the Passion, Holy Cross Province v. Touche
Ross & Co.*, 636 N.E.2d 503, 513 (Ill. 1994); *2314 Lincoln Park
West Condominium Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.*, 555
N.E.2d 346, 350 (Ill. 1990); *Redarowicz v. Ohlendorf*, 441 N.E.2d
324, 327 (Ill. 1982). It applies even where there is no
contractual interrelationship or privity of contract between the
injured plaintiff and the negligent defendant.[2] *See In re
Chicago Flood Litig.*, 680 N.E.2d at 275 (no contractual
relationship between plaintiff-business owners and the city or
the city contractor). Therefore, *Reedar* is of dubious validity
insofar as it held that damage to other property need not be
caused by a sudden or dangerous occurrence.

Nabisco also relies on *Oak State Products, Inc. v. Ecolab,
Inc.*, 755 F. Supp. 235 (C.D. Ill. 1991), in which the court

---

[2] Accordingly, that Nabisco did not have a contract nor may
ever have had the ability to contract with Defendants Catellus,
Krusinski, Specco, Hydrite, Brandonisio, or Archem is completely
irrelevant to the application of the *Moorman* doctrine.

permitted a tort action for damage to other property without a showing of a sudden or dangerous occurrence. Like *Reedar*, *Oak State* is of dubious validity in light of the Illinois Supreme Court's numerous later holdings that damage to other property must be precipitated by a sudden or dangerous occurrence. Nabisco's position that a claim for damage to other property does not also require a sudden or dangerous occurrence is not supported by any controlling authority.

Nabisco wisely asserts in the alternative that even if the *Moorman* exception does require a sudden or dangerous occurrence, the damages it sustained were caused by a sudden (albeit non-dangerous) event.[3] As stated earlier, it is now axiomatic that damage to other property must be coupled with a sudden, dangerous, or calamitous occurrence. Nabisco argues that its products were suddenly contaminated and immediately rendered unsaleable at the precise moment when the chemical solvents penetrated the poly packaging protecting its food products. Nabisco likens the supposed suddenness of the contamination of

---

[3] There are two other exceptions to the *Moorman* doctrine: where the plaintiff's damages are caused by a defendant's intentional, false representation; and where the plaintiff's damages are caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *See In re Chicago Flood Litig.*, 680 N.E.2d at 275 (citing *Moorman*, 435 N.E.2d at 443). Nabisco has not raised any argument concerning these other exceptions, so the only exception under consideration is the sudden event exception. Nabisco also does not contend that its damages were caused by a dangerous event as it concedes that the chemicals did not render the food unsafe to eat.

its food products to the suddenness of a collapsing roof. Defendants respond that the damage to Nabisco's food product occurred gradually and over a period of time, which brings Nabisco's claim squarely within the *Moorman* doctrine. This Court agrees.

*Moorman* teaches that "[w]hen the defect causes an accident involving some violence or collision with external objects, the resulting loss is treated as property damage. On the other hand, when the damage to the product results from deterioration, internal breakage, or other non-accidental causes, it is treated as economic loss." 435 N.E.2d at 449 (quotations omitted).

Nabisco cites two cases involving poorly constructed roofs as a comparison against packaged food contamination caused by airborne chemical particles. In *United Airlines, Inc. v. CEI Industries of Illinois, Inc.*, 499 N.E.2d 558 (Ill. App. Ct. 5th Dist. 1986), a gradual accumulation of water on a roof constructed by the defendant eventually caused the roof to collapse and exposed plaintiff's employees to an unreasonable risk of injury. The court allowed the negligence count because the manner in which the roof collapsed was sudden and calamitous. *Id.* at 563. Likewise, in *Electronics Group, Inc. v. Central Roofing Company*, 518 N.E.2d 369 (Ill. App. Ct. 1st Dist. 1987), the court allowed the plaintiffs to seek to recover for damage to inventory and equipment against a roof constructor when a substantial amount of water leaked through the roof during the

course of a single day. The court concluded that the substantial leaking of water which occurred in a single day was a sudden occurrence. *Id.* at 371.

At least three other cases provide examples of what is not a sudden or calamitous occurrence. Soil contamination as a result of petroleum leaking through ruptured underground storage tanks is not a sudden or calamitous occurrence. *See NBD Bank v. Krueger Ringier, Inc.*, 686 N.E.2d 704, 708 (Ill. App. Ct. 1st Dist. 1997). Flour contaminated with sand did not result from a sudden or calamitous occurrence. *See Dixie-Portland Flour Mills*, 613 F. Supp. at 989. Flakes of metal that find their way into a bakery's food product because of a poorly constructed dry ice crusher did not present a sudden or calamitous threat to person or other property. *See Cloverhill Pastry-Vend Corp. v. Continental Carbonics Prods.*, 574 N.E.2d 80, 82 (Ill. App. Ct. 5th Dist. 1991).

The contamination of Nabisco's food product by airborne chemicals that seeped through the food's poly packaging and gradually into the food product itself over a period of time is just like the contamination that occurred in the contamination cases cited above. The gradual seepage of chemical vapors or the introduction of metal flakes or sand into food products can hardly be likened to a sudden roof collapse, *see supra*, an unexpected brake failure, *see Vaughn v. General Motors Corp.*, 466

- 13 -

N.E.2d 195 (Ill. 1984), or a torrential flood, *see In re Chicago Flood Litig.* In a collapsing roof case, the time period between the calamitous event (the collapsing roof, brake failure, or flood) and the damage to other property (the inventory and equipment, the vehicle, or water damage to a store) is short and sudden, almost contemporaneous. In contamination cases like this one, the time period between the injury-causing event (here, the exposure of food products, by placement in a warehouse, to airborne chemicals) and the damage to other property (here, as Nabisco puts it, "lost profits and other additional expenses associated with testing and disposal of [Nabisco's] food products stored in the warehouse") (Nabisco's Consolidated Resp., at 8), is gradual or prolonged. The factor of sudden or calamitous event would be totally eviscerated were this Court to accept Nabisco's definition since every event could be termed sudden.[4] The *Moorman* doctrine would not then exist, a result beyond the desire or authority of this Court. For these reasons, this Court concludes that the contamination of Nabisco's food products did not occur suddenly or calamitously nor dangerously, and therefore the damages Nabisco seeks are purely economic damages for its disappointed commercial expectations. Counts III and IV of the Third Amended Complaint should be dismissed with prejudice.

---

[4] Under Nabisco's definition, the damages in the contaminated soil, sandy flour, and metallic dough cases could be deemed to have resulted from a sudden occurrence.

## B. The Complaint Adequately Pleads Breach of Contract.

Counts I and II are directed against AUL only, and allege that AUL "materially breached the Warehouse Agreement by failing to maintain the Warehouse in a 'clean . . . [and] sanitary manner,' and by failing to follow 'good warehousing practices.'" (Third Am. Compl., ¶ 40.) The complaint also alleges that AUL breached the agreement by permitting chemicals to contaminate and devalue Nabisco's food products. (*Id.*) AUL argues that Nabisco has not pled sufficient facts as to what conduct of AUL constituted the alleged breach. Accordingly, AUL moves for dismissal of Counts I and II, or alternatively, for a more definite statement, in accordance with Federal Rules of Civil Procedure 12(b)(6) and 12(e), respectively.

We reemphasize that in ruling on a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and all reasonable inferences therefrom are drawn in the plaintiff's favor. *See Zinermon*, 494 U.S. at 118 (1990). In a diversity action, the adequacy of the pleadings is assessed in accordance with the federal, not state, rules of civil procedure. *See Dawn Equipment Co. v. Micro-Trak Sys., Inc.*, 186 F.3d 981, 986 (7th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Under the federal rule of notice pleading, a "short and plain statement" of the claim suffices. FED. R. CIV. P. 8(a); *see also Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.

1997). For fair notice to be given, "a complaint must at least include the operative facts upon which a plaintiff bases his claim." *Kyle v. Morton High Sch.*, 144 F.3d 448, 455 (7th Cir. 1998) (quotations omitted). A plaintiff may plead conclusions, so long as they are sufficient to understand the gravamen of the complaint. *See Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996); *Jackson v. Marion County*, 66 F.3d 151, 153-54 (7th Cir. 1995). A breach of contract claim must allege: (1) the existence of a valid and enforceable contract; (2) performance by plaintiff under the contract; (3) breach of the contract by defendant; and (4) injury to plaintiff as a result of the breach. *See Petri v. Gatlin*, 997 F. Supp. 956, 964 (N.D. Ill. 1997).

Nabisco's complaint properly alleges a breach of contract claim against AUL. The Third Amended Complaint alleges that Nabisco and AUL entered into a valid and enforceable agreement and that Nabisco has performed its obligations under the agreement. (Third Am. Compl., ¶¶ 18, 21.) It also avers that AUL agreed to store Nabisco's food products "in compliance with food products sanitation procedures," and to segregate "poisonous or dangerous chemicals, and/or items with foul odors or other undesirable characteristics which may or have the potential to contaminate or devalue" Nabisco's food products from the area of the warehouse where Nabisco's food products were stored. (*Id.* ¶¶ 19, 40.) AUL breached the agreement, according to Nabisco, by failing to store Nabisco's food products in compliance with food

products sanitation procedures, by failing to maintain the warehouse in a clean and sanitary manner and to follow good warehousing practices, and by permitting chemicals to contaminate and devalue Nabisco's food products. (*Id.* ¶ 40.) Finally, the complaint alleges that as a result of AUL's breach, Nabisco suffered damages including lost profits, expenses incurred in shipping, storing, and retrieving contaminated products, and expenses associated with analyzing and testing the warehouse and food products. (*Id.* ¶ 41.)

AUL's discontent goes to the merits of the claims and not to the sufficiency of the allegations. First, AUL denies that it agreed to "segregate" dangerous chemicals from food products. Paragraph 4(D) of the Warehouse Agreement mandates:

> Poisonous or dangerous chemicals, and/or items with foul odors or other undesirable characteristics which may or have the potential to contaminate or devalue Product shall not be sorted or handled in the same part of the Warehouse as Product.

(Third Am. Compl., ¶ 4(D).) AUL attacks the complaint as devoid of any allegation that it "sorted or handled" dangerous chemicals near food products. However, because the terms "sorted or handled" are apparently not defined in the agreement, Nabisco's use of the term "segregated" does not mean that the complaint is fatally deficient.

Next, AUL asserts that Nabisco's allegation that AUL failed to maintain the warehouse in a "clean and sanitary manner" is "disingenuous" because there is no allegation of any "dirty or unsanitary condition." (AUL's Reply, at 8.) AUL complains that

Nabisco has failed to identify what conduct of AUL constituted a failure to maintain the warehouse in a clean and sanitary manner. However, the complaint suggests that AUL failed to keep the warehouse clean by allowing aromatic hydrocarbons to contaminate Nabisco's food products. It cannot be said at this early stage of the proceedings that as a matter of law the term "clean and sanitary" as used in the agreement does not apply to airborne chemicals.

Finally, AUL takes issue with the charge that it failed to follow "good warehousing practices," insisting that it never took any action which "adversely affected Nabisco's products." (AUL's Mem., at 7.) Again, it is too early to say that as a matter of law AUL observed "good warehousing practices" at all relevant times, and that under no set of facts could Nabisco prevail. It is not unreasonable to infer that food contaminated and rendered unsaleable by airborne chemicals resulted from a warehouse operator's failure to follow good warehousing practices.

In short, the complaint identifies specific provisions of the Warehouse Agreement which AUL allegedly breached. The alleged conduct (or failure to act) which gave rise to the purported breach include: failure to follow food products sanitation procedures, failure to segregate food products from chemicals, failure to follow good warehousing practices, and failure to maintain a clean and sanitary warehouse. All the other elements having been properly pled, the complaint properly alleges a breach of contract claim. Counts I and II should not

be dismissed for failure to state a claim, and AUL's alternative motion for a more definite statement should be denied.

### III.   Conclusion

For the foregoing reasons, this Court recommends that all non-insurer defendants' motions to dismiss Counts III and IV of the Third Amended Complaint [123-1, 124-1, 127-1, 128-1, 130-1, 179-1] be granted, and that Defendant AUL's motion to dismiss Counts I and II and for a more definite statement [123-1, 123-2] be denied.


**MARTIN C. ASHMAN**
**Dated:**   May 31, 2000.          United States Magistrate Judge

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Elaine E. Bucklo within ten (10) days after service of this Report and Recommendation. *See* FED. R. CIV. P. 72(b). Failure to object will constitute a waiver of objections on appeal.


Copies have been mailed to:

JOHN N. GALLO, Esq.
GERARD D. KELLY, Esq.
ERIN E. KELLY, Esq.
Sidley & Austin
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603

JEROME G. SNIDER, Esq.
EDWARD P. BOYLE, Esq.
KATHLEEN A. SALVATY, Esq.
CHRISTOPHER E. FALKENBERG, Esq.
Davis, Polk & Wardwell
450 Lexington Avenue
New York, N.Y.  10017

Attorneys for Plaintiff

TIMOTHY D. McVEY, Esq.
JONATHAN P. SCHAEFER, Esq.
Purcell & Wardrope, Chtd.
300 South Wacker Drive
Suite 800
Chicago, IL  60606

JAMES M. HOEY, Esq.
MARGARET H. FAHEY, Esq.
Clausen, Miller, P.C.
10 South LaSalle Street
Chicago, IL  60603-1098

WILLIS R. TRIBLER, Esq.
DAVID R. EDSEY, Esq.
Tribler, Orpett & Crone, P.C.
30 North LaSalle Street
Suite 2200
Chicago, IL  60602

Attorneys for Defendants

JOHN F. HORVATH, Esq.
HOWARD LIEBER, Esq.
Horvath & Lieber, P.C.
300 W. Washington St.
17th Floor
Chicago, IL  60606

JAMES N. NOWACKI, Esq.
AMY C. ANDREWS, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL  60601

RICKY L. HAMMOND, Esq.
MICHAEL S. SHERMAN, Esq.
Chuhak & Tecson, P.C.
225 West Washington Street
Suite 1300
Chicago, IL  60603-3418

KATHRYN J. ANDERLIK, Esq.
RICHARD JACOBSON, Esq.
Judge, James & Dutton, Ltd.
422 North Northwest Highway
Suite 200
Park Ridge, IL  60068

JOHN MEZZACAPPA, Esq.
Mound, Cotton & Wollan
One Battery Park Plaza
New York, N.Y.  10004

Attorneys for Defendants